IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI
JEFFERSON CITY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WOODS AUTO GALLERY, INC. | ) | Case No. 07-41123-DRD |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## **MEMORANDUM OPINION**

This matter is before the Court on the objection of Debtor Woods Auto Gallery, Inc.

("Debtor") to the Motion for Allowance of Fees, Costs and Expenses filed by Bank Star One

("Bank Star" or "Bank"), which is based on a Promissory Note, Commercial Security

Agreement, Floor Plan Security Agreement and Signatory Authorization, and Floor Plan

Agreement between Bank Star and Debtor.  Debtor objects to the fees, costs and expenses

claimed by Bank Star for services performed by employees and consultants of Bank Star and by

Bank Star's counsel in representing Bank Star both pre and post-petition.  Debtor contends that

many of the actions taken by professionals hired by Bank Star and Bank Star's employees were

unnecessary to protect the Bank's interests and that the amount of time spent on these and certain

other matters was not reasonable.  Bank Star contends that its aggressive pursuit of its legal

rights and remedies was a direct result of Debtor's lack of credibility and that many of the tasks

performed by its counsel were done in response to pleadings filed by Debtor.  This Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and (b).  This is a core

proceeding which this Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(B).  This

Memorandum Opinion contains my Findings of Fact and Conclusions of Law pursuant to Rule

52 of the Federal Rules of Civil Procedure as made applicable to this matter by Rules 7052 and

9014(c) of the Federal Rules of Bankruptcy Procedure.  For all the reasons set forth below, the

objection is sustained in part and overruled in part.  The Court finds that certain actions

undertaken by Bank Star's counsel, such as prosecution of the motion for relief from stay,

opposition to Debtor's motion to use cash collateral, initiation of the adversary proceeding to

determine lien priority, and the attempted foreclosure of certain real property, were unnecessary

and that the associated fees should be disallowed.  The Court does not, however, believe that

Bank Star's efforts to repossess and subsequently safeguard its collateral were unwarranted  and

overrules Debtor's objection for the fees and expenses incurred in that regard.  Finally, after

reviewing the detailed billing statements, the Court finds that certain fees, costs and expenses

should be disallowed or reduced for various reasons including lack of specificity in time entries,

or lumping of numerous tasks into one description, impairing the Court's ability to determine

whether time billed was reasonable for the tasks listed, duplication of effort or lack of need for

the described services.

## I.  FACTUAL AND PROCEDRUAL BACKGROUND

Debtor is a retailer of high-end, pre-owned vehicles.  Greg Woods is the owner and

holder of all of the issued and outstanding capital stock of Debtor.  Debtor's business premises is

located in Columbia, Missouri and is leased from a related entity, G.A. Woods Properties, LLC

("Woods Properties), a limited liability company, organized and existing under Missouri law.

Greg Woods is the owner and holder of more than two-thirds (2/3) of the equity interest in

Woods Properties.  On September 29, 2006, Debtor, its principal, Greg Woods, and Greg

Woods' wife, Angella Woods, executed a promissory note in favor of Bank Star in the original

principal amount of $1,609,365 and obtained a line of credit in the amount of $1,965,000 for the

purpose of acquiring or carrying inventory for resale.  As security for the loan, Debtor, along

with non-debtor entities, Greg Woods, Angella Woods and Woods Properties, and Bank Star

executed, some or all of, a series of documents ("Loan Documents"), including the following:

(a)  a Floor Plan Agreement and Signatory Authorization, executed by Debtor and Bank Star; (b)

a separate Floor Plan Security Agreement, executed by Debtor and Bank Star; ( c) a Commercial

Security Agreement, executed by Debtor and Greg and Angella Woods as individuals and Bank

Star; (d) a Real Estate Deed of Trust, purporting to grant Bank Star a mortgage on 18.8 acres of

real property, located in Columbia, Missouri and commonly referred to as 6300 Scott Rd., which

is owned by Woods Properties; and (e) a Real Estate Deed of Trust, purporting to grant Bank

Star a mortgage on two commercial properties, which consist of Debtor's business premises,

located at 124 and 202 E. Nifong Boulevard, located in Columbia, Missouri, also owned by

Woods Properties.

At some point after the execution of the Loan Documents, but prior to March 28, 2007,

Debtor defaulted in performance of its obligations by failing to pay Bank Star for a number of

vehicles that were subject to the terms of the Floor Plan Security Agreement and by failing to

account for the proceeds from those sales.  On or about March 28 and April 5, 2007, Bank Star

exercised its rights under the Loan Documents and seized possession of 41 vehicles from Debtor.

Bank Star obtained insurance for the vehicles and incured expenses for them to be transported

and stored at a facility located in St. Louis, Missouri.  On April 4, 2007, Bank Star filed a

Petition against Debtor in the Circuit Court of Boone County, Missouri and obtained a writ of

prejudgment attachment on all assets of Debtor and Greg Woods and Angella Woods, as

individuals.  Bank Star incurred attorney's fees and expenses associated with Debtor's default

under the Loan Documents, the initiation of the state court action and the repossession.

On April 10, 2007 Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On April 12, 2007, Debtor filed the following pleadings: an Emergency Motion to Use Cash Collateral, Granting Adequate Protection to Bank Star and Scheduling a Final Hearing on the Use of Cash Collateral; Adversary Complaint No. 07-02015 in which Debtor sought turnover of the vehicles which Bank Star seized and the avoidance of Bank Star's purported security interest in certain of Debtor's assets; and an emergency motion in the adversary to compel Bank Star to turnover Debtor's vehicle inventory pursuant to 11 U.S.C. § 542.

In its April 12 pleadings, Debtor sought the immediate return of all the vehicles and related documentation seized by Bank Star on March 28 and April 5, 2007.  In exchange, Debtor offered Bank Star the following adequate protection:  a promise to pay, in cash and in full, the entire unpaid principal balance due and owing to Bank Star, including accrued and unpaid interest, within 90 days from the entry of the Order for Relief; a detailed plan for satisfying its obligation to the Bank, which consisted of paying Bank Star the net proceeds received from Greg Woods' proposed refinancing of Woods Properties' interest in the properties located at 6300 Scott Rd. and 124 and 202 E. Nifong Blvd. and all funds received from the sale of Debtor's vehicle inventory; a requirement that Debtor pay all proceeds received from the sale of vehicles to Bank Star within 48 hours of the sale; a provision that Bank Star be permitted to maintain physical possession of the keys and titles to the vehicles until its receipt of sale proceeds therefor; a provision that Bank Star be permitted access to Debtor's business premises and records at any time; and a provision that Bank Star be permitted to maintain a bank employee, or

a "keeper," at the dealership at all times to safeguard the Bank's collateral.

Also filed on April 12, 2007, was Bank Star's Emergency Motion for Relief from the Stay wherein Bank Star sought an order allowing it to complete the foreclosure on Debtor's vehicle inventory or, alternatively, for adequate protection. On April 16, 2007, the Court conducted an omnibus hearing on Debtor's motion to use cash collateral, Debtor's motion for turnover of its inventory and Bank Star's motion for relief. The Court issued an order which authorized Debtor's use of cash collateral, granted Bank Star adequate protection upon substantially the terms proposed by Debtor and preliminarily denied Bank Star's motion for relief. By subsequent order dated, April 20, 2007, the Court granted Debtor's emergency motion for turnover of Debtor's vehicle inventory.

On April 30, 2007, Bank Star filed Adversary Case No. 07-02021 against Debtor and 20 consumers who had purchased vehicles from Debtor prior to the filing of the bankruptcy. Bank Star sought a determination that it, rather than the consumer-defendants, was entitled to "ownership" and possession of the vehicles because it had possession of the certificates of title for those vehicles. A final hearing was held on the motion to use cash collateral and the motion for relief from the automatic stay on May 31, 2007 and subsequent orders were entered authorizing Debtor to use cash collateral and denying Bank Star's motion for relief.

Subsequent to the Court's order authorizing Debtor's motion to use cash collateral, which specifically included an adequate protection provision involving Greg Woods refinancing certain mortgages of Woods Properties in order to satisfy its debt, Bank Star initiated a non-judicial foreclosure of those precise mortgages. This action by Bank Star resulted in the filing of an emergency motion to enjoin the pending foreclosures and a hearing before this Court on June 15,

2007.  On June 19, 2007, the Court entered a preliminary injunction against Bank Star and its

counsel, Charles Hapke, to cease and desist from any attempt to foreclose the referenced

mortgages, which was to expire by its own terms on July 10, 2007.  On July 3, 2007, Debtor

filed an emergency motion commanding Bank Star to marshal its lien, to release certain liens

upon receipt of payment and approving certain post-petition financing.  At the hearing on this

motion, the parties reported to the Court that they had resolved substantially all of the claims and

controversies between them.  On July 10, 2007, exactly one day after Debtor had initially stated

that it would satisfy its obligation to Bank Star, Debtor tendered checks to Bank Star in the

amount of $1,309,240.00, an amount which represented the principal and interest then due and

owing to Bank Star under the Loan Documents.

Bank Star filed its motion for allowance of fees, costs and expenses seeking the

allowance and payment of certain pre-petition fees, costs and expenses in the amount of

$136,127.30 and post-petition fees, costs and expenses in the amount of $424,691.76 for a total

requested  amount of $560,819.06.   As noted above, Debtor has objected to Bank Star's request.


## II.  DISCUSSION AND ANALYSIS

### A.  Applicable Legal Framework

Bank Star seeks to bifurcate its request into pre and post-petition fees, costs and

expenses.  It  cites *In re CP Holdings, Inc*., 332 B.R. 380 (W.D. Mo.2005), *aff'd,* 206 Fed. Appx.

629 (C.A.8 (Mo)), as support for the proposition that the reasonableness standard applicable in a

§ 506(b) analysis does not apply to fees, costs or expenses incurred pre-petition, and, therefore,

the Court must simply allow all of its pre-petition fees and expenses without any review.

Debtor, also citing *CP Holdings*, as well as other support, argues that all fees, costs and expenses are subject to the same § 506(b) analysis regardless of when they accrued, but if not, that state law governs the reasonableness of pre-petition fees.

The debtor in *CP holdings* objected to Judge Federman's finding that § 506(b) does not apply to pre-petition claims. *CP Holdings,* 332 B.R. at 392. After reviewing several other courts' interpretations of the plain language of § 506(b), the District Court, in affirming the bankruptcy court's ruling, concluded that § 506(b) only applies to fees, costs and expenses accrued post-petition. *Id. citing In re Leatherland Corp*., 302 B.R. 250 (Bankr.N.D. Ohio2003) (discussing and rejecting the application of § 506(b) to pre-petition fees); *In re Vanderveer Estates Holdings*, 283 B.R. 122, 131 (Banker. E.D. N.Y. 2002) (pre-petition interest, fees and costs are part of the secured creditor's claim and are not governed by § 506(b)); *In re Cummins Utility, L.P.*, 279 B.R. 195, 201 (Bankr. N.D. Texas 2002) (finding that § 506(b) applies only to post-petition fees and that pre-petition fees, if at all, are allowed as part of the underlying secured claim).

In *Leatherland*, the Court observed that there exists a split of authority regarding the applicability of § 506(b) to pre-petition fees, costs and expenses. *Leatherland*, 302 B.R. at 256-258. The *Leatherland* Court was more persuaded by the decisions which limit the applicability of § 506(b) to post-petition fees, costs and expenses based on the fact that the subsection allows "interest" and "reasonable fees, costs or charges" to be added to an "allowed secured claim." *Leatherland,* 302 B.R. at 258; 11 U.S.C. § 506(b). Because an "allowed secured claim" includes interest, fees, costs and charges arising pre-petition, the argument is that they, therefore, are not governed by § 506(b). *Id.; see also Vanderveer*, 283 B.R. at 131; 4 *Collier on Bankruptcy*,

-7-

¶ 506.04 [1] at 506-101, 506-102 (15th ed. Rev.202).

The Court finds the reasoning behind the *Leatherland* line of cases logical and persuasive and thus rejects Debtor's argument that § 506(b) applies equally to pre and post-petition fees, costs and expenses.  Debtor's assertion that Judge Fenner's ruling in *CP Holdings*, regarding the non-applicability of § 506(b) to fees, costs and expenses incurred pre-petition, is merely *dicta* is inaccurate.   In reviewing the relevant cases, and noting that the debtor cited no case where a pre-petition expense was subject to a § 506(b) analysis, Judge Fenner held, "[a]ccordingly, this Court finds that the Bankruptcy Court correctly concluded that Bankruptcy Code § 506(b) does not apply to [a prepayment premium incurred pre-petition] and the Bankruptcy Court's decision is affirmed." *CP Holdings*, 332 B.R. at 392.  The issue was clearly posed and decided. Similarly, the Court disagrees with Debtor's argument that the Eighth Circuit's opinion, affirming *CP Holdings*, offers contrary authority regarding the applicability of § 506(b) in this jurisdiction.  The fact that the Eighth Circuit dodged the precise question of applicability of § 506(b) to pre-petition fees, costs and expenses, and decided that the pre-petition charge was reasonable, does not affect the value of the case as precedent.  Debtor's citation to  *First Western Bank & Trust v. Drewes (In re Schriock Constr., Inc.)*, 104 F.3d 200 (8th Cir. 1997) as additional contrary authority is also misplaced.  In that case, the issue was the preempting effect of § 506(b) on contrary state law which would invalidate an attorney's fee provision.  *Schriock* says nothing about the issue before this Court.

The Court  is convinced that the law in this jurisdiction is that § 506(b) does not apply to the pre-petition fees, costs or expenses requested by Bank Star.  This finding, however, does not carry the day for the Bank because, although a § 506(b) analysis may not be applicable to pre-

petition fees, costs, expenses, the Court finds that it must still review said fees, costs and

expenses for reasonableness under both Missouri law and the controlling language in the Loan

Documents.

### 1. Pre-petition Fees, Costs and Expenses

Federal courts follow the "American Rule" which requires the parties to bear the

expense of their own attorney's fees unless they are provided for by statute or contract. *Travelers*

*Cas. and Sur. Co. of Am. v. Pacific Gas and Elec. Co.,* 127 S. Ct. 1199, 1200, 167 L.Ed.2d 178

(U.S. 2007)*.* In this instance, there is contractual authority for Bank Star's receipt of attorney's

fees and collections costs. Relevant provisions are contained in the Promissory Note and the

Floor Plan Agreement. Pursuant to the Promissory Note executed by the parties, Debtor is

contractually obligated to pay the following:

> COLLECTION COSTS AND ATTORNEY'S FEES. I agree to pay all costs of
> collection, replevin or any other or similar type of cost if I am in default. In addition, if
> you hire an attorney to collect this note, I also agree to pay any fee you incur with such
> attorney, plus court costs (except where prohibited by law). To the extent permitted by
> the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and
> costs you incur to collect this debt as awarded by any court exercising jurisdiction under
> the Bankruptcy Code.

This provision requires that the fees be incurred in actions designed to collect the balance due on

the note. Debtor is also obligated to pay attorney's fees and costs pursuant to paragraph 11 of

the Floor Plan Agreement:

> 11. . . . We agree, in case of default, to assemble the Collateral, at our expense, at a
> convenient place acceptable to [Bank Star] and pay all costs incurred by [Bank Star] for
> the collection of the Notes and the other Obligations, and for the enforcement of [Bank
> Star's] rights hereunder or under law, including *reasonable* attorneys' fees and legal
> expenses. . . . [Bank Star] may retain from the proceeds of any sale, attorney's fees, costs
> and charges for pursuing, searching for, removing, taking, keeping, storing, advertising,
> and selling the Collateral (emphasis added).

This provision limits the recoverable fees and expenses to reasonable amounts.

The allowance of interest, fees, costs and expenses accrued pre-petition is governed by applicable state law. *Cummins*, 279 B.R. at 201.  Under Missouri law, "[i]f a contract provides for the payment of attorney's fees and expenses incurred in the enforcement of a contract provision, the trial court must award them to the prevailing party." *McCarthy v. Beal Bank*, 2005 WL 2260859 (W.D. Mo.2005) *citing Magna Bank of Madison County v. W.P. Foods Inc.*, 926 S.W.2d 157, 162-63 (Mo.App.1996).  This rule applies where the contract is a promissory note. *McCarthy*, 2005 WL at *1.  Even if the contract had not provided that attorney's fees and costs be "reasonable", Missouri courts have found that, "as a matter of public policy, reasonableness is an implied term in every contract for attorney's fees." *Dalton Petroleum, Inc. v. Devlin Energy Group, L.L.C.*, 2005 WL 1518391 (W.D. Mo. 2005) *citing Chase Resorts, Inc. v. Campbell*, 913 S.W.2d 832, 835 (Mo.App.Ct.1995) (if a party could not contract with its attorneys for an unreasonable fee, it necessarily follows that parties could not lawfully contract for reimbursement of more than a reasonable fee.)  The trial court, or in this case, the Bankruptcy Court, is an expert on attorney's fees, and may award reasonable amounts as a matter of law. *In re Kroh Brothers Dev. Co.*, 105 B.R. 515, 521 (Bankr. W.D. Mo.1989); *Chase Resorts*, 913 S.W.2d at 836 *citing Campbell v. Kelley*, 719 S.W.2d 769, 772 (Mo. Banc 1986).

## 2.  Post-petition Fees, Costs and Expenses

Pursuant to 11 U.S.C. § 506(b), a secured creditor is entitled to augment its claim by fees, costs and charges incurred if they are reasonable in amount and provided for by the agreement under which the claim arises.  *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989).  In order to recover attorney's fees, a secured creditor must establish that: (1) it was secured by

property of a value in excess of the amount of the claim; (2) the requested fees are reasonable; and (3) the agreement giving rise to the claim authorizes the recovery of the fees.  *White v. Coors Distrib. Co. (In re White)*, 260 B.R. 870, 880 (B.A.P. 8th Cir. 2001); *In re Spidel*, 207 B.R. 882, 885 (Bankr. W.D. Mo.1997).  In determining the reasonableness of the fees, the court must consider whether the actions taken were reasonable and prudent in the circumstances in protecting the creditor's interest in the collateral and whether the amounts sought for the services performed are reasonable.  *White*, 260 B.R. at 880; *In re Cushard*, 235 B.R. 902, 906-07 (Bankr. W.D. Mo.1999).  To determine whether the actions of counsel were necessary to protect the creditor's interest, the court typically looks at: (1) whether, and to what extent, the creditor was oversecured; (2) whether the debtor provides for payment of the secured claim; and (3) whether the creditor faced a risk of nonpayment.  *In re Harvey,* 2004 WL 1146628, *3 (W.D. Mo. 2004); *In re Thomas*, 186 B.R. 470, 478 (Bankr. W.D. Mo.1995).

Secured creditors are not entitled to be reimbursed for fees incurred in every action taken by their counsel.  *Harvey, 2004 WL at *3; Thomas*, 186 B.R. at 478; *Kroh*, 105 B.R. at 521.  "In determining whether a secured creditor should be reimbursed for its attorneys' fees, the bankruptcy court has the responsibility of preventing overreaching by attorneys in their attempts to be paid attorneys' fees from the estate."  *Kroh*, 105 B.R. at 515, 520.  While creditors "... are entitled to engage counsel and pay for constant, comprehensive and aggressive representation, ... where services are not reasonably necessary or where action is taken because of an attorney's excessive caution or overzealous advocacy, courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b)."  *Kroh*, 105 B.R. at 521 *quoting In re Wonder Corp. of Am.*, 72 B.R. 580, 591 (Bankr. D. Conn. 1987), *a'ffd*, 82 B.R. 186 (D.

-11-

Conn.1988).  It is unreasonable to seek reimbursement for fees "that are not cost justified either

by the economics of the situation or necessary to preservation of the creditor's interest in light of

the legal issues involved." *Kroh*, 105 B.R. at 521 *quoting Matter of Nicfur-Cruz Realty Corp*., 50

B.R. 162, 167-68 (Bankr. S.D.N.Y.1985).

The creditor bears the burden of proof on each of these various elements.  *Harvey, 2004*

*WL at *3; White*, 260 B.R. at 880; *Cushard*, 235 B.R. at 906; *Kroh*, 105 B.R. at 520.  An

applicant must provide supporting documentation that describes the nature of the services in

sufficient detail to permit the court to determine that they are authorized by the agreement,

necessary and reasonable.  *Harvey, 2004 WL at *3; Spidel*, 207 B.R. at 887.  Accordingly,

whenever the "itemization of work performed is not sufficiently specific to identify the services

rendered, the charges for those services will be disallowed.  *Kroh*, 105 B.R. at 522 *quoting  In*

*the Matter of Interstate Stores, Inc*., 437 F. Supp. 14, 16 (S.D.N.Y. 1977).  Courts have required

applicants to state the specific "purpose, nature and substance of telephone calls, conferences,

legal research, court appearances, depositions and preparation for court appearances or

depositions" before fees may be awarded for them.  *Kroh*, 105 B.R. at 522.  An "applicant may

not circumvent the requirements of detail by 'lumping' a number of activities into a single

entry." *Id.*  Each "type of service should be listed with the corresponding specific time

allotment," *In re Wiedau's, Inc*., 78 B.R. 904, 908 (S.D. Ill.1987); and the "task descriptions set

out in the application" should be sufficiently clear that the court can determine "whether the

tasks related meaningfully to the protection of the creditor's interests." *In re Kalian*, 178 B.R.

308, 318 (Bankr. D.R.I.1995). When insufficient detail has been provided, the court may

disallow requested compensation.  *Kroh*, 105 B.R. at 522.  The court may also disallow or reduce

-12-

entries it finds are duplicative or unnecessary.  *Spidel*, 207 B.R. at 887.  Overall, the court has

broad discretion in determining the amount of fees to be allowed.  *Thomas*, 186 B.R. at 477;

*Kroh*, 105 B.R. at 520.

## B.  Allowance of Requested Fees, Costs and Expenses

The parties do not dispute that the Loan Documents create a contractual obligation on the

part of Debtor to pay certain fees, costs and expenses upon default.  Similarly, there is no dispute

that Bank Star is an oversecured creditor.  The question for the Court is whether Bank Star's

requests are reasonable and whether the actions for which it seeks payment fall within the scope

of the language contained in the Loan Documents.

## 1. Repossession Fees, Costs and Expenses

Bank Star's pre-petition activity consisted primarily of seizure of its collateral and

initiation of state court proceedings to collect on the defaulted loan.  Upon discovery of Debtor's

default, Bank Star orchestrated a large scale repossession, involving transportation of some 41

high-end vehicles more than 100 miles, for storage and safekeeping, an action which the Court

finds was both necessary and reasonable considering that its collateral was being sold, or

otherwise transferred off Debtor's lot, without the Bank receiving necessary payment as

contemplated by the Loan Documents.  In addition to attorney's fees, Bank Star incurred costs

and expenses related to the repossession including: gas, mileage, food and lodging expenses for

its employees to assist in the repossession, insurance for the vehicles, an attachment bond,

towing and repair costs, and storage costs.[1]

---

[1] The total amount of the costs and expenses requested by Bank Star for the repossession, included in detail on Exhibit A to the Bank's motion for allowance of fees, costs and expenses, is $55,043.58.  See Exhibit Nos. 5, 6, 7, 21, 22, 23, 24, 28 - 41, 44, 45, 47, 49, 50 and 52.

Debtor objects to these costs and expenses on the basis that Bank Star failed to satisfy its burden of showing that they fall within the definitional scope of "costs of collection" or charges for "removing, taking, keeping, storing" the collateral, as contemplated by the language contained in the Promissory Note and Floor Plan Agreement. The Court disagrees. There is no dispute that Debtor was in default of the Loan Documents, which triggered the Bank's right to pursue and safeguard its collateral. All of the requested fees associated with the repossession are itemized by date, amount and purpose. Additionally, there was clear and convincing testimony regarding the necessity of utilizing Bank Star employees in the repossession effort when the transportation company hired failed to provide sufficient space to transfer the vehicles. The Court finds that these expenses are reasonable and that Bank Star's actions fell within the "removing, taking, keeping, storing" language contained in the Loan Documents.

### 2. Donaldson Security Fees, Costs and Expenses

Bank Star seeks approval of a significant amount of costs and expenses incurred, both pre and post-petition, as a result of its employ of Donaldson Security, LLC, a company located in Park Hills, Missouri. Bank Star's representative testified that it was necessary to have a guard on Debtor's premises 24 hours a day to ensure the safekeeping of its collateral. Debtor admitted to selling cars "out of trust" and that it was involved in other questionable transactions, which supports a finding that security was reasonable and necessary in this situation to safeguard the Bank's collateral. The order authorizing Debtor to utilize cash collateral contained an adequate protection provision which specifically allowed the Bank to maintain a "keeper" on Debtor's premises during business hours to monitor Debtor's business transactions, which the Bank did. The evidence, although not crystal clear, suggests that Bank Star paid for two guards per twenty-

four hour period (each working a twelve hour shift), at $20.00 per hour, plus food, gas, lodging

and mileage.  The Court finds that the fees incurred to maintain a guard to protect Bank Star's

collateral were reasonable and prudent, but only for the hours where Bank Star's "keeper" was

not in place.  Therefore, the Court will disallow a total amount of $23,666.00 for security

services.[2]

Bank Star also seeks approval of $32,710.13 of security related expenses, which consist

of mileage, food and lodging for the security guards.  When questioned about the decision to hire

a security company halfway across the state whose employees had to incur such exorbitant costs

to provide Bank Star with security, versus one in Columbia, Bank Star responded simply that it

---

[2] The evidence regarding Donaldson Security's costs to Bank Star is unclear.  The invoices appear to indicate that the guards were paid $20 per hour, however, there are some discrepancies.  Similarly, a mathematical analysis of the invoices sometimes supports testimony that there was only one guard on duty for each twelve hour period, however, there are inconsistencies.

For the purpose of clarity, the Court is going to presume an hourly rate of $20 and that Debtor's business was open six days a week for eight hours a day. The Court's order of April 20, 2007 sets forth Bank Star's right to maintain a "keeper" on Debtor's premises, and physical possession of the vehicles was turned over to Debtor on April 23, 2007.  Therefore, the Court (without reference to amounts indicated as due on the invoices) will allow for two guards, one for each twelve hour period, at $20.00 per hour, from April 23rd to July 10th.  The Court will then deduct from that total, the amount equal to eight  hours a day, six days a week, as those are the times the Court will presume the "keeper" was in place, and thus having a security guard during those hours would be duplicative, unnecessary and therefore, unreasonable.

The one exception to this formula will be the allowance in full of  Invoice Nos. 7 and 24, because they appear to represent the cost for security of the vehicles while they were in the process of being repossessed, which reasonably could have involved more than one guard per 12 hour period.

The sum of all Donaldson invoices for services only, excluding Nos. 7 and 24, equals $56,054.00.  Therefore, after application of the Court's formula for determining a reasonable amount for security, the total amount of Donaldson service fees that will be disallowed is the difference between $56,054.00 and $32,388.00, which is $23,666.00.  See Addendum A for formula.

was not aware of a security company in Columbia.  The Court finds the Bank's response

remarkably vague and unpersuasive and believes it is unreasonable to require Debtor to pay

these expenses.  The Court will disallow $32,710.13 of expenses as set forth in Addendum A.

### 3. Consulting Fees, Costs and Expenses

Debtor objects to the approval of all consulting fees incurred by Bank Star as

unreasonable and outside the scope of the contractual terms of the Loan Documents.  The Court

agrees.   Testimony regarding the work performed by these various consulting firms was cryptic

and incredibly vague at best.  For example, when asked about what service Wohldmann

Financial provided, one Bank Star representative stated that he "did not know" what Wohldmann

did and another representative expanded on that by stating that Wohldmann "looked at the car

titles" and that it "accumulated and assimilated" information about the titles.  Testimony

regarding R. E. Smith was equally unconvincing, with the Bank's representative not being able

to recall which "experts" Smith was able to identify.  Bank Star offered none of the work product

performed by the consultants or "experts" and none of these individuals testified before the

Court.  Because of the scant evidence, both as to the necessity of the services as well as to what,

if any, benefit they conferred, the Court believes Bank Star failed to discharge its burden of

proving that they are expenses of the kind encompassed by the contractual terms of the Loan

Documents.  Additionally, the Court finds it would be unreasonable to require Debtor's estate to

pay for consulting fees where the CEO of the lender, Joe Stewart, Jr., has 31 years of banking

experience and 18 years of collection agency experience, and is thus overwhelmingly qualified

to formulate a plan for collecting on a defaulted loan.  Finally, the various invoices offered to

support the consultants' services offer no details as to the basis of the charges, the amount of

time expended or the precise services rendered and therefore, make it impossible for this Court to determine if they were reasonable. For those reasons, the Court will disallow a total amount of $12,420.59 for the consulting fees and costs as specifically set forth in Addendum B.

### 4. Servicing Fees

Pursuant to the Loan Documents, Debtor is contractually obligated to pay Bank Star quarterly servicing fees in the total amount of $4,500 per year. Bank Star seeks $1,125.00 for the third quarter servicing fee which includes 6/29 - 9/29.[3] Because Debtor paid the principal and accrued interest due on the loan on July 10, 2007, the Court finds that to require Debtor to pay the fee for the entire quarter is unreasonable. There are a total of 92 days in the third quarter. Division of the quarterly fee by this number works out to be approximately $12.23 per day. This number multiplied by the 11 days the loan was still outstanding in the third quarter, is the prorated portion of the servicing fee that the Court will allow. The Court will disallow the remaining service fee amount of $990.47.

### 5. Pre and Post-Petition Attorneys' Fees, Costs and Expenses

Bank Star also seeks recovery of its pre-petition attorney's fees of $43,995.00, and post-petition attorney's fees of $326,936.00, for a total attorney's fee request of $370,931.00, an amount which was amassed in a little over four months. Because the language contained in the Loan Documents specifically allows recovery of reasonable attorney's fees and because Missouri law implies a requirement of reasonableness, the Court's review and analysis of the pre-petition attorney's fees shall be the same as that of post-petition attorney's fees under § 506(b).

---

[3] See Exhibit No. 95.

The Court regards the gross amount of the Bank's request for reimbursement of attorney's fees and expenses as manifestly unreasonable, a case of overreaching.  Nonetheless, the Court has reviewed each entry in the statements of fees and expenses tendered by the Bank in support of its request and has tried to be as specific as possible in identifying amounts it has determined to disallow and the reasons for the disallowance.

Debtor objects to Bank Star's request for attorney's fees in its entirety based on the argument that all of the Bank's actions were unnecessary, and often inimical, to the full and prompt payment of its claim. That noted, the Court will address some of Debtor's more specific objections which generally fall within one of the following areas: (a) preparation, filing and prosecution of the motion for relief from automatic stay and opposition to the Debtor's motion for use of cash collateral; (b) foreclosure of the Nifong Boulevard and Scott Rd. properties; (c) preparation and filing of Adversary No. 07-02021; and (d) the general lack of specificity in certain time entries.

### a.   Prosecution of Motion for Relief and Opposition to Motion to Use Cash Collateral

Debtor contends that the filing of the motion for relief from stay was premature in that bankruptcy courts seldom grant relief from the stay early in a reorganization where doing so would result in foreclosure of a debtor's primary income-producing property.  Debtor also argues the relief motion was completely unnecessary considering that Bank Star was oversecured by a substantial margin and thus there was little or no risk that Bank Star would not be paid in full. To that end, Debtor intimates that Bank Star was so secure in its secured status that it encouraged its counsel to "proceed with collection efforts with unbridled zeal."[4]  On this point, the Court

---

[4] See Debtor's objection to the fee request, p. 21.

notes that the amount sought by Bank Star in post-petition attorney's fees, costs and expenses is
almost four times the amount sought by Debtor's counsel. Incredibly, this works out to Bank
Star billing Debtor, on average, more than $4,500 per day during the 90 day period before
Debtor satisfied its obligation in full.

While the Court may not go so far as to say Bank Star proceeded with an "unbridled
zeal," it does find that the Bank's counsel galloped along at a remarkably swift pace. In a
situation where there is only one oversecured creditor, appropriate security is in place to monitor
the collateral, and there is a date certain when payment will be received or the stay lifted, as was
the case here, doing a bit of grazing while waiting to be fed may be the most reasonable plan of
action. First, there is no question that Bank Star is an oversecured creditor, indeed, this fact was
firmly established by Debtor's satisfaction of the Bank's claim, in full, with interest, by
liquidating, or refinancing debt on, only a portion of the collateral. Second, Debtor's initial
filings proposed that Bank Star, its one and only oversecured creditor, would be paid in cash and
in full, within 90 days of the entry of the Order of Relief, or by July 9, 2007. Finally, the Court
ordered that Bank Star be given adequate protection, which included a number of safeguards to
ensure that the Bank's collateral was not jeopardized while it waited for the 90 days to run.

Bank Star argues that filing the motion for relief was a reasonable vehicle for raising
concerns about Debtor's proposal for payment. Indeed, a relevant theme throughout Bank Star's
pleadings and testimony was that because of the unprecedented complexity of the case and
egregiousness of Debtor's wrongdoings, and because Debtor had failed to cure defaults or meet
deadlines for payment in the past, that it could not rely on Debtor's stated proposal to pay the
full obligation within 90 days. Thus, the Bank argues its aggressive pursuit of its legal remedies

-19-

was both reasonable and necessary to protect its collateral.

The Court has no doubt that the Bank's counsel performed the tasks they were requested or directed to perform by their client.  It is equally clear to the Court that the Bank's "scorched earth" litigation strategy was driven more by distrust of and animus toward the Debtor rather than reasoned judgment.  Considerations of efficiency and economy in the use of legal resources were abandoned.  At one time or another, the Bank had no less than four law firms and six consultants engaged to do battle with the Debtor.  While the Bank's distrust was well-earned based on the Debtor's defalcations and failures, that history did not warrant much of what was done after the Chapter 11 case was filed.  The Debtor admitted having sold vehicles out of trust and made no attempt to defend it, instead offering, without prompting from the Bank, to include in the cash collateral order numerous provisions designed to prevent it from occurring again. The Debtor conceded that previous restructuring efforts had failed to materialize and imposed on itself a deadline by which the Bank would be paid all principal and interest or have full resort to all its collateral.  These assurances were not just additional empty promises but orders entered as part of a court-supervised proceeding.  With the Court ordered safeguards in place, all Bank Star needed to do was let the 90 day period run, and proceed from there.  While it may be true that the Bank's prospect of repayment was not certain, it was certain that the Bank would either receive payment in full or access to all of its collateral within a limited period of time pursuant to an order issued by this Court.

That said, because Bank Star could not have predicted how Debtor planned to proceed in its Chapter 11 before Debtor's intentions were revealed in the motion to use cash collateral, the Court will allow the fees and expenses associated with preparation of the motion for relief.

-20-

However, based on all the aforementioned reasons, the Court will disallow all fees and expenses associated with pursuit of the motion for relief and opposition to the motion to use cash collateral after the motion was filed on April 12, 2007.  A total of $22,546.50 will be disallowed as set forth in Addendum C.

### b.    Foreclosure of Nifong Blvd. and Scott Rd. Properties

Debtor objects to the fees and expenses associated with Bank Star's attempted foreclosure of the Nifong Blvd. and Scott Rd. properties.  Debtor argues that Bank Star's effort in this regard was not only unreasonable, but that it was inimical to the Bank's ultimate goal of being paid.  The Court's Order of April 20, 2007, authorizing Debtor's interim use of cash collateral, specifically contemplates that Debtor's principal, Greg Woods, will refinance one or more of Woods Properties' mortgages and pay the net proceeds to the Bank.  The Court cannot conceive of how foreclosing the very collateral which is intended, if Debtor's efforts were successful, to produce the lion's share of the Bank's claim, could be considered necessary and prudent.  The Court finds the proposed sale particularly wasteful in light of Bank Star's admitted testimony that, as to one of the properties, because it did not have sufficient capital to pay off the first mortgage, it could not have placed a credit bid at the sale and thus, it would not have been able to realize any value from the sale unless there was a bidder prepared to pay off the first and the second mortgages on the property.  There was no evidence presented to convince the Court that this was reasonable likely to occur.  Therefore, the Court will disallow a total of $14,231.88 of attorneys' fees as set forth in Addendum D, which represents all fees and expenses associated

with the attempted foreclosure and opposition to Debtor's motion to enjoin the same.[5]

Included in Bank Star's Exhibit A are a number of entries for "letter reports" on certain real properties.[6]  Because there is no testimony or other evidence to regarding the purpose or necessity of these reports, the Court is left to guess as to why these costs were incurred.  Giving Bank Star the benefit of the doubt, the Court will presume that the Bank needed updated title information on the properties it intended to foreclose prior to the Chapter 11 filing, therefore the pre-petition "letter report" costs will be allowed.  However, because the Court determined that the attempted post-petition foreclosure of Scott Rd. and Nifong Blvd. was unnecessary, the Court, again presuming that these expenses relate to the foreclosure effort, will disallow these expenses.  The Court will disallow a total of $200 for the "letter reports."  The Court will also disallow the cost of publishing the foreclosure notices for the Nifong Blvd. properties in the amount of $1,410.88.[7]

### c.    Fees, Costs and Expenses Associated with Adversay No. 07-02021

Debtor also contends that the Court should deny all fees relating to the filing and prosecution of Adversary No. 07-02021.  Debtor cites *In re Elk Creek Salers, LTD*., 290 B.R. 712 (Bankr. W.D. Mo.2003) as authority for its assertion that the language contained in the Promissory Note and the Floor Plan Agreement regarding recoupment of fees, costs and expenses is not broad enough to include an adversary action to determine whether Bank Star's

---

[5] The Court notes that Debtor's motion to compel the Bank to cease the attempted foreclosure also included a motion to show cause why the Bank should not be held in contempt for violating the automatic stay and a request for sanctions.  To the extent that it could, the Court only disallowed those fees related to the attempted foreclosure.

[6] See Exhibit Nos. 8, 10, 11, 61, 73, 74 and 98.

[7] See Exhibit No. 76.

liens on Debtor's vehicle inventory survived sales to Debtor's customers who did not obtain

titles. The decision in *Elk Creek* appears to be directly on point with the facts of this case. The

language contained in the "Collection Costs and Attorney's Fees" provision of the promissory

note in both cases provides that the Debtor will pay "all costs of collection, replevin or any other

or similar type of cost," and to pay attorney's fees "[i]f you [Bank Star] hire an attorney to

collect this note...." *Elk Creek*, 290 B.R. at 715. Both notes also require the debtor to pay "the

reasonable attorney's fees and costs you [Bank Star] incur to collect this debt as awarded by any

court exercising jurisdiction under the Bankruptcy Code." *Id.* The *Elk Creek* Court interpreted

this language as restricting the ability to recover attorney fees to those actions taken to *collect* a

debt and found that:

> [T]his provision restricts the Bank's ability to recover its attorney fees to those actions
> that are taken to collect the debt owed to the Bank. The note limits the Debtor's
> obligation to pay attorney fees to collection actions, including replevin actions. "Collect"
> is defined as "to claim and receive in payment or fair recompense" and "to present as due
> and receive payment for." WEBSTER'S THIRD NEW INTERNATIONAL
> DICTIONARY (Unabridged, 1981). As generally understood by lawyers, "collection
> actions" encompass such things as filing lawsuits, obtaining attachments and
> garnishments, and undertaking replevins and repossessions. See Missouri Creditor's
> Remedies (5th Ed., 2001).

> *Elk Creek*, 290 B.R. at 715.

After reviewing cases with similarly restrictive language in the promissory note, the *Elk*

*Creek* Court held that the language in the Bank's promissory note was not broad enough to

include an adversary to determine lien priority:

> While the Adversary Proceeding might very well eventually assist the Bank in getting
> paid the full amount it is owed on the note, the Adversary Proceeding in and of itself is
> not an action to collect on the note. It is an action to enhance the Bank's secured position
> and perhaps give it greater leverage and greater ability to collect all that it is owed.

*Elk Creek,* 290 B.R. at 716-717.

Bank Star concedes that the attorney fee provision in its Promissory Note is identical to that at issue in *Elk Creek*, but argues that the language contained it its other documents is broad and all-encompassing enough to include an adversary of the type it pursued. Bank Star contends that its Loan Documents, when read together, specifically the provision in the Floor Plan Agreement, allowing attorney's fees and costs for the "pursuing, searching for, removing, taking, keeping, storing advertising, and selling" of the collateral, are expansive enough to include an adversary to determine lien priority. The Court disagrees. Seeking a declaration regarding whether its liens survived sales to customers who did not receive a title is encompassed by none of the activities specifically outlined in the Floor Plan Agreement. Had Bank Star's Loan Documents included a provision similar to the one in *In re Hyer*, 171 B.R. 67 (Bankr. W.D. Mo.1994), the outcome here may have been different. In *Hyer*, the promissory note language was similar to the note in *Elk Creek* and Bank Star's note, but the security agreement contained very broad language requiring the debtor to pay the bank's fees "with respect to any suit or proceeding (bankruptcy or otherwise) relating to this Agreement, the Collateral or any other agreement, guaranty, note, instrument or document..., or to attempt to enforce...any security interest in any of the Collateral...." *Hyer*, 171 B.R. at 69. Had Bank Star's Loan Documents contained expansive language, similar to that in *Hyer*, this Court would likely have allowed Bank Star to collect reasonable fees and costs associated with the adversary.

Additionally, the Court finds that even if a case could be made for finding that Bank Star's activities related to Adversary No. 07-02012 were encompassed by the provisions of the Loan Documents, the Court believes incurring these fees under the circumstances was unreasonable, given the time frames involved and the complexity of that adversary. Bank Star

-24-

could merely have waited 90 days and either been paid in full, in which case it could simply

forego making these claims (which is precisely what occurred) or repossess the inventory to

which it was clearly entitled, initiate non-judicial foreclosures on the real estate and then

determine whether it was necessary or appropriate to pursue those persons to whom Debtor had

sold vehicles without delivering the titles.  Therefore, because the Court finds that the Loan

Documents in this case are restrictive, not expansive, and because pursuing this adversary was

unnecessary and unreasonable, the Court will disallow a total of $58,089.50 of fees associated

with Adversary No. 07-02021 as set forth in Addendum E.

### d. Defective time entries

Finally, Debtor argues that a vast majority of the timekeeper entries are defective as a

result of lack of specificity, duplication of tasks, lack of value and/or necessity associated with

the services rendered and/or "lumping" of numerous tasks.  The Court has reviewed, in detail,

the itemized statements of fees, costs and expenses submitted as evidence.  After that review, the

Court has concluded that certain of the entries on the fee statements should not be allowed or

should be allowed in an amount less than the amount stated.  In some instances, the descriptions

of the services rendered are not sufficiently specific to permit the Court to determine precisely

what was done, whether it was necessary and whether the amount of time spent was reasonable.

In some cases, the entries included travel time or involved attorney's billing for tasks the Court

finds more suitable for a paralegal.  In certain other instances, many tasks were lumped together

which prevented a meaningful review of them by the Court.  Although the Court has the

discretion to disallow entries which are lumped together, because a vast majority of the entries in

this case are lumped, the Court made an attempt to disallow only those portions of the lumped

entries which are related to a task the Court decided was unnecessary or which is duplicative.
While the Court's attempt to calculate a reasonable amount of time for allowed tasks, from a
time entry which includes multiple tasks, may appear subjective and create uncertainties
regarding how the Court arrived at certain numbers, this is a direct result of the way in which the
time was billed and illustrates why this practice is problematic.

Some of the time entries include hours billed for time traveling between Columbia and
Kansas City or Jefferson City.  There is no indication that any work was being performed during
these periods.  The Court finds that it is appropriate to discount that time and allow it at half
counsel's normal hourly rate. *In re Vantage Investments, Inc.,* 328 B.R. 137, 145 (Bankr. W.D.
Mo.2005)*; see also Bachman v. Laughlin (In re McKeeman)*, 236 B.R. 667, 672 (8th Cir. 1999)
(unreasonable to charge full hourly rate for travel time) *citing In re Anderson Grain Corp*., 222
B.R. 528, 532 (Bankr.N.D.Tex1998) (same).  Accordingly, the Court will reduce by half, entries
billed which include travel time.

Bank Star seeks fees, costs and expenses from Walther, Antel, Stamper & Fischer, P.C.
in the total amount of $15,603.83.  The fee statements submitted as evidence support a fee
amount of $8971.03, therefore, $6,632.80 is disallowed on the basis of no documentary support.
The remaining amount of $8971.03 is disallowed because the statements are defective in that
they fail to identify rates charged, which attorney or attorneys performed the work or, the
amount of time spent.  In addition, the descriptions of the services performed are very general.
Testimony regarding these statements was equally vague.  Therefore, the Court will disallow
these statements in their entirety.   Additionally, the Court will disallow or reduce certain other
time entries which are defective for various reasons, as set forth in Addendum F.

### III.  CONCLUSION

For all the reasons stated above, Debtor's objection to Bank Star's motion for approval of fees, costs and expenses is sustained in part and overruled in part.  The Court overrules Debtor's objection insofar as it seeks disallowance in their entirety of the fees, costs and expenses requested by Bank Star.  The Court does agree, however, that some of the fees, costs and expenses incurred by Bank Star were unnecessary for all the reasons previously outlined, and therefore, unreasonable, and that some fees should be disallowed due to defective time entries. The Court sustains Debtor's objection to Bank Star's fees, costs and expenses in the total amount of $197,892.02.  The remaining fees, costs and expenses in the amount of $362,927.04  shall be allowed.

A separate order will be entered on the objection in accordance with Rule 9021.


DATED:  _____December 27, 2007_____          _____/s/ Dennis R. Dow_____
                                                 HONORABLE DENNIS R. DOW
                                                 UNITED STATES BANKRUPTCY JUDGE

Copies to:
Terry Summers
Kathryn Bussing
James F.B. Daniels

**Addendum A**

**Donaldson Security Expenses**

| Ref. # | Expense Amount Disallowed |
|--------|---------------------------|
| 7 | $493.00 |
| 25 | $530.59 |
| 48 | $2,982.48 |
| 54 | duplicate of Ref. # 48 |
| 59 | $3,073.64 |
| 65 | $2,736.16 |
| 71 | $4,824.24 |
| 75 | $6,617.33 |
| 87 | $3,252.00 |
| 91 | $1,712.00 |
| 100 | $6,488.69 |
| **Total disallowed expenses related to food gas, mileage and lodging for security guards:** | **$32,710.13** |

Formula used to calculate amount the Court will allow for security services:

11 weeks, 3 days; each week is 24x7=168 hrs minus keeper hours of 8x6=48; so pay guards for 168-48 =120 hrs; 120 hrs x $20 per hr = $2,400 per wk; $2,400 x 11 wks = $26,400; plus extra three days of $1,120----includes the pre-petition fees from Invoice Nos. 7 and 24 $4,868.

**Addendum B**

**Consulting Fees, Costs and Expenses**

| Ref # | Payee | Amount Disallowed |
|-------|-------|-------------------|
| 12 | Wohldmann Financial | $3,427.46 |
| 13 | E.J. Hauschild | $1,000.00 |
| 20 | R.E. Smith | $1,000.00 |
| 42 | Wohldmann Financial | $1,149.05 |
| 51 | S.E. Wieberg | $1,430.35 |
| 78 | R. Knott | $1,700.00 |
| 79 | R. Nolting | $1,700.00 |
| 79 | R. Nolting | $923.73 |
| 82 | J.C. Stewart | $90.00 |
| | **Total disallowed costs and expenses related to consulting firms and expert witnesses:** | **$12,420.59** |

**Addendum C**

**Fees Related to Prosecution of the Motion for Relief and Opposition to the Motion to Use Cash Collateral**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|-----------|-------------------|
| 4/14/0 | Terry Summers | 8.70 | $2,566.50 |
| 4/15/07 | Terry Summers | 15.90 | $4,690.50 |
| 4/16/07 | Kathryn Bussing | 11.10 | $3,052.50 |
| 4/16/07 | Terry Summers | 12.80 | $3,776.00 |
| 4/23/07 | Murie Bolen | 1.30 | $169.00 |
| 4/23/07 | Murie Bolen | .50 | $65.00 |
| 5/30/07 | Kathryn Bussing | 8.10 | $2,227.50 |
| 5/30/07 | Richard Beheler | 7.10 | $1,952.50 |
| 5/31/07 | Kathryn Bussing | 7.10 | $1,952.50 |
| 5/31/07 | Terry Summers | 7.10 | $2,094.50 |
| | | **Total disallowed fees associated with prosecution of the motion for relief and opposition to cash collateral motion :** | **$22,546.50** |

**Addendum D**

**Fees, Costs and Expenses Associated with the Attempted Foreclosure of the Scott Rd. and Nifong Blvd. Properties**

| Date | Timekeeper or Expense | Time Entry | Amount Disallowed |
|------|----------------------|------------|-------------------|
| 5/16/07 | Charles A. Hapke | .45 | $123.75 |
| 5/22/07 | Charles A. Hapke | .55 | $151.25 |
| 5/23/07 | Charles A. Hapke | 2.70 | $742.50 |
| 5/24/07 | Charles A. Hapke | 2.45 | $673.75 |
| 5/25/07 | Charles A. Hapke | 2.75 | $756.25 |
|  | certified mail costs |  | $41.68 |
| 5/30/07 | Charles A. Hapke | 1.30 | $357.50 |
| 6/1/07 | Charles A. Hapke | 5.40 | $1,485.00 |
|  | postage costs |  | $20.48 |
| 6/4/07 | Charles A. Hapke | 1.80 | $495.00 |
| 6/5/07 | Charles A. Hapke | .65 | $178.75 |
| 6/6/07 | Charles A. Hapke | 2.50 | $687.50 |
| 6/7/07 | Charles A. Hapke | 1.00 | $275.00 |
| 6/8/07 | Charles A. Hapke | 1.00 | $275.00 |
| 6/11/07 | Charles A. Hapke | .35 | $96.25 |
| 6/13/07 | Charles A. Hapke | 3.6 | $990.00 |
| 6/14/07 | Charles A. Hapke | 12.50 | $3,437.50 |
|  | mileage costs |  | $97.97 |
| 6/18/07 | Charles A. Hapke | .25 | $68.75 |
| 6/20/07 | Charles A. Hapke | .80 | $220.00 |
| 7/3/07 | Charles A. Hapke | .50 | $137.50 |
| 6/7/07 | Terry Summers | 3.50 | $1,032.50 |

| 6/13/07 | Terry Summers | 9.1 (Court divided time entry by number of lumped tasks and will disallow 2.3 hrs related to foreclosure) | $678.50 |
|---|---|---|---|
| 6/14/07 | Terry Summers | 8.20 (Court reduced time entry by half to disallow portion related to foreclosure) | $1,209.50 |
| 4/20/07 | Guaranty Land Title | unnecessary cost | $100.00 |
| 5/24/07 | Boone Central Title | unnecessary cost | $25.00 |
| 5/22/07 | Boone Central Title | unnecessary cost | $50.00 |
| 5/29/07 | Columbia Daily Tribune | unnecessary cost | $547.00 |
| 5/29/07 | Columbia Daily Tribune | unnecessary cost | $863.88 |
| 7/6/07 | Boone Central Title | unnecessary cost | $25.00 |
| | | **Total disallowed fees and expenses associated with attempted foreclosure:** | **$15,842.76** |

**Addendum E**

**Blackwell Fees Associated with Adversary No. 07-02021**

June 6, 2007 Fee Statement (for services provided through 5/31/07):

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|-----------|-------------------|
|  | All of Richard Beheler's time for this fee statement |  | $21,532.50 |
| 5/1/07 | Murie Bolen | 1.60 | $208.00 |
| 5/2/07 | Murie Bolen | .20 | $26.00 |
| 5/4/07 | Murie Bolen | 1.40 | $182.00 |
| 5/7/07 | Terry Summers | 2.50 | $737.50 |
| 5/8/07 | Terry Summers | 2.00 | $590.00 |
| 5/9/07 | Murie Bolen | .30 | $39.00 |
| 5/15/07 | Murie Bolen | .60 | $78.00 |
| 5/15/07 | Murie Bolen | .20 | $26.00 |
| 5/16/07 | Terry Summers | 1.40 | $413.00 |
| 5/21/07 | Mike Fielding | .90 | $216.00 |
| 5/21/07 | Terry Summers | 3.10 | $914.50 |
| 5/22/07 | Murie Bolen | .20 | $26.00 |
| 5/22/07 | Mike Fielding | 3.10 | $744.00 |
| 5/22/07 | Terry Summers | 2.10 | $619.50 |
| 5/28.07 | Murie Bolen | .10 | $13.00 |
|  |  | **Total amount of disallowed fees from the June 7, 2007 Fee Statement (for work provided through 5/31/07):** | **$26,365.00** |

August 7, 2007 Fee Statement (for services provided through 6/30/07):

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| | All of Richard Beheler's time for this fee statement | | $10,147.50 |
| | All of Bob Hammeke's time for this fee statement | | $10,260.00 |
| 6/1/07 | Ben Mann | .40 | $166.00 |
| 6/5/07 | Mike Fielding | .70 | $168.00 |
| 6/6/07 | Terry Summers | 2.60 | $767.00 |
| 6/7/07 | Murie Bolen | .60 | $78.00 |
| 6/11/07 | Terry Summers | 2.60–lumped | $767.00 |
| 6/12/07 | Murie Bolen | .30 | $39.00 |
| 6/13/07 | Murie Bolen | .40 | $52.00 |
| 6/15/07 | Terry Summers | .30 | $88.50 |
| | | **Total amount of disallowed fees from the August 7, 2007 Fee Statement (for work provided through 6/30/07):** | **$22,533.00** |

August 7, 2007 Fee Statement (for services provided through 7/31/07):

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|

| | All of Richard Beheler time except for the following: 7/12/07-.40 7/13/07-.80 7/25/07-.60 | | $5,995.00 |
|---|---|---|---|
| 7/2/07 | Bob Hammeke | .90 | $243.00 |
| 7/3/07 | Bob Hammeke | 1.40 | $378.00 |
| | | **Total amount of disallowed fees from the August 7, 2007 Fee Statement (for work provided through 7/31/07):** | **$6,616.00** |

**Charles Hapke Fees Associated with Adversary No. 07-02021**–the following fees are being disallowed due to both duplication of effort of Bank Star's bankruptcy counsel and because the Court has decided not to allow any time for the adversary.

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 4/16/07 | Charles Hapke | 3.80 | $1,045.00 |
| 4/18/07 | Charles Hapke | 7.60 | $2,090.00 |
| 4/23/07 | Charles Hapke | 2.60 | $715.00 |
| 4/24/07 | Charles Hapke | 2.60 | $715.00 |
| 4/25/07 | Charles Hapke | .80 | $220.00 |
| | | **Total Disallowed:** | **$4,785.00** |

**Addendum F**

**Disallowed Fees Due to Defective Time Entries and other Miscellaneous Reasons**

**1.      Court Unable to Determine if Time Billed is Reasonable–Reduced by 50%**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 4/17/07 | Terry Summers | 5.50 | $811.25 |
| 4/18/07 | Terry Summers | 9.00 | $1,327.50 |
| 4/19/07 | Terry Summers | 8.30 | $1,224.25 |
| 5/4/07 | TerrySummers | 4.90 | $722.50 |
| 5/24/07 | Kathryn Bussing | 5.60 | $770.00 |
| 5/29/07 | Kathryn Bussing | 6.70 | $921.25 |
| 6/27/07 | Kathryn Bussing | 4.10 | $563.75 |
| | | **Total Disallowed:** | **$6,340.50** |

**2.      Travel Time Reduced by 50%**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 4/20/07 | Terry Summers | 8.60 (Court assumes 4 hrs of entry is travel and will reduce that by half) | $590.00 |
| 4/19/07 | Charles Hapke | 19.30 (Court assumes 4 hrs of lumped entry is travel and will reduce that by half) | $550.00 |
| 5/22/07 | Charles Hapke | 11.35 (Court presumes 4 hrs of lumped entry is travel and will reduce that by half) | $550.00 |

|  |  | **Total Disallowed:** | **$1,690.00** |
|---|---|---|---|

### 3.       Tasks More Appropriately Performed by Paralegals-Reduced by 50%

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 4/23/07 | Kathryn Bussing | 4.90 | $673.75 |
| 4/26/07 | Kathryn Bussing | 5.10 | $701.25 |
|  |  | **Total Disallowed:** | **$1,375.00** |

### 4.       Unnecessary or Duplicative Tasks

| Date | Timekeeper | Time Entry | Reason for Disallowance | Amount of Disallowance |
|---|---|---|---|---|
| 4/27/07 | Charles Hapke | .10 | Unnecessary for lawyer to review sales contracts | $27.50 |
| 4/29/07 | Charles Hapke | .30 | Unnecessary for lawyer to review sales contracts | $82.50 |
| 5/2/07 | Charles Hapke | .40 | Unnecessary for lawyer to review sales contracts | $110.00 |
| 5/8/07 | Charles Hapke | 1.00 | Unnecessary for lawyer to review sales contracts (reduced by half due to lumping of two tasks) | $137.50 |

| 5/9/07 | Charles Hapke | 1.35 | Unnecessary for lawyer to review sales contracts (reduced by half due to lumping of two tasks) | $185.63 |
|---|---|---|---|---|
| 5/10/07 | Charles Hapke | 4.50 | Unnecessary for lawyer to review sales contracts (reduce by half due to lumping of two tasks) | $618.75 |
| 5/17/07 | Charles Hapke | 1.75 | Unnecessary for lawyer to review sales contracts (reduced by a third due to lumping of three tasks) | $159.50 |
| 6/22/07 | Charles Hapke | .60 | Unnecessary for lawyer to review sales contracts (reduced by half due to lumping of two tasks) | $82.50 |
| 6/23/07 | Charles Hapke | .45 | Unnecessary for lawyer to review sales contracts (reduced by half due to lumping of two tasks) | $61.86 |
| 6/26/07 | Charles Hapke | .60 | Unnecessary for lawyer to review sales contracts (reduced by half due to lumping of two tasks) | $82.50 |

| Date | Timekeeper | Time Entry | Reason for Disallowance | Amount |
|---|---|---|---|---|
| 4/23/07 | Laura Toledo | 7.60 | Unnecessary for timekeeper to attend/supervise turnover of cars | $1,634.00 |
| 4/24/07 | Laura Toledo | 2.30 | Unnecessary for timekeeper to attend/supervise turnover of cars | $494.50 |
| 4/25/07 | Lauara Toledo | 3.40 | Unnecessary for timekeeper to attend/supervise turnover of cars | $731.00 |
| 4/26/07 | Laura Toledo | 4.80 | Unnecessary for timekeeper to attend/supervise turnover of cars | $1,032.00 |
| 5/1/07 | Laura Toledo | .50 | Unnecessary for timekeeper to attend/supervise turnover of cars | $107.50 |
| | | | **Total Disallowed:** | **$5,547.24** |

### 5.       Descriptions Not Sufficiently Specific

| Date | Timekeeper | Time Entry | Reason for Disallowance | Amount Disallowed |
|---|---|---|---|---|
| | Walther, Antel, Stamper & Fischer's fee and cost statements | | Lack of specificity, lack of time estimate, no indication of hourly rate | $8,971.03 |
| | Walther, Antel, Stamper & Fischer | | Court will disallow the remaining portion of the requested fees for this firm because there is no fee statement in evidence to support the request | $6,632.80 |

| | | | Total Disallowed: | $15,603.83 |
|---|---|---|---|---|

**Addendum G**

**Total Amount of Disallowed Fees, Costs and Expenses**

| Fee, Cost or Expense Disallowed | Amount Disallowed |
|---|---|
| Donaldson Security fees for security | $23,666.00 |
| Donaldson Security expenses | $32,710.13 |
| Consulting and expert fees | $12,420.59 |
| Servicing fees | $990.47 |
| Fees for the prosecution of the motion for relief and opposition to Debtor's use of cash Collateral | $22,546.50 |
| Fees and costs associated with the attempted foreclosure of Nifong Blvd. and Scott Rd. properties | $15,842.76 |
| Fees associated with Adversary No. 07-02021 | $60,299.00 |
| Fees disallowed due to miscellaneous reasons | $29,416.57 |
| **Total Amount of Fees, Costs and Expenses Disallowed:** | **$197,892.02** |